UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:15-CV-81049-ROSENBERG/HOPKINS

TRANSUNION RISK AND ALTERNATIVE
DATA SOLUTIONS, INC.,

    Plaintiff,

v.

SURYA CHALLA,

    Defendant.
_____/

## MEMORANDUM OPINION AND ORDER

**THIS CAUSE** is before the Court on Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law [DE 8]. The Court has carefully reviewed the Motion and all pertinent portions of the record. In addition, the Court held an evidentiary hearing on February 19, 2016, and is otherwise fully advised in the premises. The Court now issues this Memorandum Opinion and Order setting forth its findings of fact and conclusions of law. For the reasons set forth below, the Motion is DENIED.

### I.    INTRODUCTION

This is an action for breach of a restrictive covenant contained in an employment contract. *See* DE 1. In the Motion presently before the Court, Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS") seeks preliminary injunctive relief to enforce a non-compete agreement entered into by TRADS and Defendant Surya Challa ("Challa"). *See* DE 8. Although TRADS has a substantial likelihood of success on the merits of its claim against Challa for breach of the non-compete agreement, TRADS is not entitled to preliminary injunctive relief

1

because Challa has presented sufficient evidence to rebut the presumption that TRADS will suffer irreparable injury unless an injunction issues.

## II. FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence.

### A. TRADS and Its Competitors in the Data Fusion Industry

TRADS is a data fusion company offering products and services designed to retrieve and compile data from a wide range of sources. Hrg. Tr. 29:19–30:24.[1] Its core data fusion software product is TLOxp. Hrg. Tr. 29:24–30:7. TRADS' customers, including government agencies, law enforcement agencies, licensed private investigators, and financial services companies nationwide, use TLOxp to obtain a comprehensive set of data on a particular individual, business entity, or asset. Hrg. Tr. 29:19–30:24, 32:5–7.

TRADS and Interactive Data, LLC ("Interactive"), a subsidiary of IDI, Inc. ("IDI"), are competitors in the data fusion industry. Hrg. Tr. 32:16–20, 61:10–18, 193:19–21. IDI offers a simple data fusion product called IDI Basic, which is used by debt collection agencies, debt buyers, process servers, and bail bondsmen. Hrg. Tr. 61:20–62:3. In addition, IDI will soon launch a more sophisticated data fusion product, idiCORE, to compete directly with TLOxp. Hrg. Tr. 62:4–63:1, 123:11–14.

While TRADS and Interactive are competitors, the two companies share an historical association with TLO, LLC ("TLO"). Through TLO, entrepreneur Hank Asher ("Asher") and his Chief Science Officer, Ole Poulsen, pioneered the data fusion industry. Hrg. Tr. 60:19–25. In 2012, TLO acquired Interactive—one of its competitors at the time—with the intent that

---

[1] All citations containing the abbreviation "Hrg. Tr." refer to the transcript of the evidentiary hearing held February 19, 2016.

Interactive's principals would manage TLO. Hrg. Tr. 81:12–82:2. As a result, TLO and Interactive were fully integrated, each with unfettered access to the other's information. Hrg. Tr. 85:2–5. Interactive remained part of TLO at the time TLO entered bankruptcy. Hrg. Tr. 82:3–5. During bankruptcy, however, TLO's acquisition of Interactive was unwound, and Interactive was transferred out of TLO. Hrg. Tr. 84:14–85:1, 82:6–8; Hrg. Ex. 3, 4. TRADS was formed when its parent company, TransUnion, acquired TLO out of bankruptcy in December of 2013. Hrg. Tr. 26:16–18, 27:16–21. Interactive was later acquired by The Best One, Inc. ("TBO"), a holding company formed by Michael Brauser ("Brauser"). Hrg. Tr. 58:11–14. As the result of a subsequent merger, both TBO and Interactive are now subsidiaries of IDI. Hrg. Tr. 58:15–19.

The data fusion industry is highly competitive and non-compete agreements are common. Hrg. Tr. 32:11–15, 34:4–13. Both TRADS and IDI use non-compete agreements to protect valuable confidential and proprietary information, including the identities of their clients, sales and revenue information, pricing of their products and services, identities of their data vendors, types of data acquired and incorporated into specific products, prices paid to acquire data, product strengths and weaknesses, technology and systems used to fuse data, training materials provided to employees, and employees' salaries. Hrg. Tr. 34:14–35:16, 74:18–75:21, 121:24–122:18. Perhaps most important is the way each company's proprietary software fuses data, as this is essentially what sets one data fusion company apart from another. Hrg. Tr. 47:16–48:18.

### B. Challa's Employment at TLO and TRADS

From April of 2011 through December of 2013, Challa was employed as a programmer by TRADS' predecessor, TLO. Hrg. Tr. 92:2–5. While employed by TLO, Challa was not responsible for computer infrastructure or information technology ("IT") support. Hrg. Tr. 92:23–93:1. On April 4, 2011, Challa executed a Confidentiality, Nondisclosure,

Noncompetition, Nonsolicitation, and Nondisparagement Agreement (the "Prior Non-Compete) with TLO and its affiliates. Hrg. Ex. 1; Hrg. Tr. 93:4–17. Pursuant to its terms, the Prior Non-Compete would remain in effect for a period of two years following the end of Challa's employment with TLO. Hrg. Ex. 1.

Following TransUnion's acquisition of TLO, TRADS extended an offer of employment to Challa, subject to the Prior Non-Compete. Hrg. Ex. 5; Hrg. Tr. 95:8–18. Challa accepted that offer and began his employment with TRADS on December 18, 2013. Hrg. Ex. 5; Hrg. Tr. 95:5–18. Challa was employed by TRADS from December of 2013 through December of 2014, first as a programmer, then as the director of TRADS' data development team. Hrg. Ex. 5; Hrg. Tr. 95:5–18, 98:1–15, 118:8–9. As the director of TRADS' data development team, Challa oversaw the team of programmers responsible for creating, maintaining, and improving TRADS' data fusion software and linking algorithms. Hrg. Tr. 99:1–101:2. In that role, Challa evaluated TLOxp's strengths and weaknesses, communicated with TRADS' clients and data vendors, attended executive meetings, and had access to a broad swath of TRADS' confidential and proprietary information. Hrg. Tr. 36:17–37:11, 101:3–8, 102:1–16, 104:19–108:22; Hrg. Ex. 9.

As part of the process of integrating TLO with TransUnion, TRADS offered all former TLO employees, including Challa, the opportunity to enter into a new non-compete agreement that would remain in effect for a period of one year, rather than two, following the end of employment with TRADS. Hrg. Tr. 41:10–42:4. Challa accepted that offer and entered into a new Noncompetition and Nonsolicitation Agreement (the "Agreement") with TRADS on March 14, 2014. Hrg. Ex. 6; Hrg. Tr. 96:12–21. The Agreement provides in relevant part as follows:

> Beginning on the Effective Date and ending one (1) year after the end or termination of Individual's employment, Individual will not directly or indirectly, either as owner, principal, agent, employee, employer, stockholder, co-partner, or consultant, or in any other individual or representative capacity:

4

>    (a) engage in a business or activity that is the same as or similar to any Business conducted by the Company during Individual's employment by the Company . . . ; [or]
>
>    (b) *enter into any employment or business relationship with any person or entity that engages in a Business that is the same as or similar to any Business conducted by the Company during Individual's employment by the Company, including*, without limitation, LexisNexis, Reed Elsevier, Thomson-Reuters Corporation, IRBsearch, Tracers Information Specialists Inc., LocatePLUS, Masterfiles Inc., Equifax Inc., Experian Information Solutions Inc, MicroBilt Corportation, *Interactive Data LLC*, CBCInnovis, eBureau, Verisk Analytics Inc. and Dun & Bradstreet.

Hrg. Ex. 6 (emphasis added). At the time he signed the Agreement, Challa understood that he agreed not to enter into any employment with any of TRADS' competitors, including Interactive, for one year after the end of his employment with TRADS. Hrg. Tr. 97:9–23.

In November of 2014, Challa was offered a position with Bloomberg in New York City.[2] Hrg. Tr. 113:2–24. Challa tendered his resignation, informing TRADS' leadership that he had accepted the position with Bloomberg. Hrg. Tr. 114:21–115:4, 181:9–17. Around the same time, Brauser offered Challa a position with Interactive's then-parent company, TBO. Hrg. Tr. 115:5–18, 116:7–14. Concerned that TRADS would initiate legal action against him for a perceived breach, Challa told Brauser about the Agreement. Hrg. Tr. 116:15–17, 116:23–117:5. Brauser stated that he would take care of Challa, which Challa interpreted to mean that Brauser would provide Challa with legal counsel and would continue to pay Challa's salary if Challa were enjoined from working for Brauser's company. Hrg. Tr. 117:6–19.

On December 3, 2014, Challa returned a signed offer letter to TBO. Hrg. Tr. 117:20–118:7; Hrg. Ex. 13. Challa's last day at TRADS was two days later, December 5, 2014. Hrg. Tr. 118:8–9. However, Challa did not inform anyone at TRADS prior to leaving that he had accepted a position with TBO and would not be working for Bloomberg in New York City. Hrg.

---

[2] Bloomberg is not one of TRADS' competitors. Hrg. Tr. 44:23–45:1.

Tr. 118:10–18.

### C. Challa's Employment at TBO n/k/a IDI

Challa began his employment with IDI[3] as Vice President of Technology around December 16–18, 2014. Hrg. Tr. 63:16–19, 119:14–21; Hrg. Ex. 13. In anticipation of launching the new data fusion platform idiCORE, Challa was hired to build a secure cloud-based infrastructure to manage a high volume of sensitive data sets. Hrg. Tr. 63:20–23. Challa accepted the position at IDI with the understanding that he would be responsible for setting up this cloud-based infrastructure rather than contributing directly to the development of idiCORE. Hrg. Tr. 212:1–17.

Challa and his team at IDI are responsible solely for building the cloud infrastructure and assisting in the migration of idiCORE and IDI Basic onto the cloud. Hrg. Tr. 69:3–9, 123:15–18, 128:10–13, 212:8–25. Challa has no responsibility for data development or software creation at IDI. Hrg. Tr. 86:4–17, 132:15–133:16. Challa has no involvement with linking initiatives, algorithm initiatives, source code, evaluating the quality of data received from data vendors, or evaluating the strengths and weaknesses of data fusion products. Hrg. Tr. 134:19–136:3. During his employment with IDI, Challa has not contributed a single line of computer code to any of IDI's data fusion products, nor has he supervised or assisted anyone who has. Hrg. Tr. 136:11–19, 213:6–8. IDI's data team, which is responsible for writing code and creating software, is located in Seattle, Washington, while Challa is located in Boca Raton, Florida. Hrg. Tr. 57:2–3, 86:4–17, 126:11–17.

Accordingly, Challa's role at IDI differs from his role at TRADS. While Challa was primarily responsible for the creation, maintenance, and improvement of TLOxp at TRADS, Challa has not been involved in the creation of IDI's competing product, idiCORE. Hrg. Tr.

---

[3] The Court will refer to both TBO and IDI as "IDI" for the remainder of this Memorandum Opinion and Order.

128:10–12. At TRADS, Challa never worked on any infrastructure, whether in the cloud or in the office, while his primary responsibility at IDI is setting up a cloud-based infrastructure. Hrg. Tr. 137:3–5.

Within the data fusion industry, a company's infrastructure is not entirely separate from the products and services it provides. TRADS presented testimony from Armando Escalante, Challa's former supervisor, suggesting that software and hardware are "intimately linked" in the data fusion industry, as a result of which Challa's experience developing software at TRADS necessarily helps Challa set up an infrastructure for other data fusion products. 197:1–198:6, 200:6–201:11, 201:23–202:2. Additionally, Challa admits that building a cloud infrastructure to house IDI's products contributes to the functionality of those products. Hrg. Tr. 127:8–128:4. Housing products on the cloud permits greater sales inasmuch as it allows the products to operate quickly and efficiently even as the volume of IDI's clients expands. Hrg. Tr. 123:19–124:2. Challa also admits that communication with IDI's data team in Seattle has been an essential part of his work building the cloud-based infrastructure to house the product developed by that team. For example, the data team has provided input regarding the number of servers, performance capabilities, and security features desired in the infrastructure, and Challa has adjusted the infrastructure accordingly. Hrg. Tr. 128:14–25. Challa even travelled to Seattle about six times in the last quarter of 2015. Hrg. Tr. 123:1–10.

Despite this apparent link between software and hardware, however, TRADS presented no evidence that Challa has used or is using any of TRADS' confidential or proprietary information in his current employment, or that his departure from TRADS has caused any harm except a delay in product development.[4] Hrg. Tr. 54:10–13, 166:20–22, 189:4–6. Rather, the

---

[4] Challa's departure from TRADS would have resulted in such delay regardless of where Challa was subsequently employed.

preponderance of the evidence suggests that this has not been the case. To begin with, Challa had experience with cloud infrastructure prior to joining IDI, most recently in 2011. Hrg. Tr. 122:21–25. Challa further testified that there was no proprietary knowledge or information he obtained in connection with developing TLOxp that was relevant or useful in building the infrastructure and interacting with the data team responsible for developing idiCORE. Hrg. Tr. 129:1–7, 130:2–22, 147:22–25, 210:12–18. Challa explained that configuring hardware and manipulating "big data" is a public concept with plenty of research publicly available. Hrg. Tr. 207:20–208:11, 208:24–210:11, 211:18–25. There is nothing about the way in which Challa and his team at IDI set up the infrastructure that is unique to the data fusion industry. Hrg. Tr. 209:1–23. While at IDI, Challa has not been called upon to disclose, reveal, or rely on any confidential or proprietary information he obtained from his work on TLOxp or with TRADS generally, and Challa has made it clear to IDI's data development team that he would not reveal such information. Hrg. Tr. 130:23–131:19.

### III.  CONCLUSIONS OF LAW

Based on the findings of fact set forth above, the Court makes the following conclusions of law.

#### A. Standard for Preliminary Injunction

To obtain a preliminary injunction against Challa, TRADS must establish that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to TRADS outweighs whatever damage the proposed injunction may cause Challa; and (4) if issued, the injunction would not be adverse to the public interest. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). "In this Circuit, '[a] preliminary injunction is

8

an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the "burden of persuasion"' as to each of the four prerequisites." *Id.* (quoting *McDonald's*, 147 F.3d at 1306).

### 1. Likelihood of Success on the Merits

TRADS must first establish that it has a substantial likelihood of success on the merits of its claim for breach of a restrictive covenant. Pursuant to its terms, the Agreement at issue in this case is governed by Florida law. *See* Hrg. Ex. 6. Under Florida law, claims for breach of a restrictive covenant are governed by "Fla. Stat. § 542.335, which 'contains a comprehensive framework for analyzing, evaluating and enforcing restrictive covenants contained in employment contracts.'" *See Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009) (quoting *Envtl. Servs, Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. Dist. Ct. App. 2009)). Under that framework, the Court concludes that TRADS has a substantial likelihood of success on the merits.

#### a. Legitimate Business Interests

To succeed on its claim for breach of a restrictive covenant, TRADS must first "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." *See Proudfoot*, 576 F.3d at 1231 (quoting Fla. Stat. § 542.335(1)(b)). "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." Fla. Stat. § 542.335(1)(b). The term "legitimate business interest" includes, among other things, "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets." *Id.*

The Court concludes that TRADS has established the existence of one or more legitimate business interests justifying the restrictive covenant at issue in this case. The evidence presented,

9

including Challa's own testimony, establishes that during his employment at TRADS, Challa had access to such information as the identities of clients, sales and revenue information, pricing of products and services, identities of data vendors, types of data acquired and incorporated into specific products, prices paid to acquire data, product strengths and weaknesses, technology and systems used to fuse data, training materials provided to employees, and employees' salaries. Representatives of both TRADS and IDI testified that they consider such information to be proprietary and confidential. Protecting the valuable confidential and proprietary information to which Challa had access during his employment at TRADS is a legitimate business interest justifying the restrictive covenant.

### b. Reasonableness

TRADS must also "plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." *See* Fla. Stat. § 542.335(1)(c). "If [TRADS] establishes prima facie that the restraint is reasonably necessary, [Challa] has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests." *See* Fla. Stat. § 542.335(1)(c). "If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." *Id.*

The Court concludes that, to the extent the Agreement at issue in this case prevents Challa's employment setting up a cloud-based infrastructure to house IDI's data fusion products, the Agreement is reasonably necessary to protect TRADS' legitimate business interest. Although the Agreement contains a broader restriction preventing Challa from employment *in any capacity*

with a competitor in the data fusion industry, the Court need not decide whether such a restriction is reasonably necessary in order to determine that TRADS has a substantial likelihood of success on the merits of its claim. The Court need only find that Challa has breached an enforceable restrictive covenant.[5] The Court concludes that, at a minimum, the Agreement is reasonably necessary and therefore enforceable to the extent that it prevents employment at IDI in the specific capacity in which Challa is currently employed. Thus, TRADS has a substantial likelihood of success on the merits of its claim for breach of a restrictive covenant, regardless of whether a broader restriction preventing employment in any capacity with a competitor in the data fusion industry is reasonably necessary.

A restriction preventing employment at IDI in the specific capacity in which Challa is currently employed is reasonably necessary because such employment endangers TRADS' confidential and proprietary information. The Court notes that "[i]t is unclear under Florida law when confidential information will justify a broad restriction that prevents an employee from working for a competitor." *Proudfoot*, 576 F.3d at 1235 n.12. Some courts have concluded that a restriction preventing employment with a competitor is reasonably necessary to protect confidential information whenever a former employee is in a position to use that information, while others have concluded that such a restriction is reasonably necessary only if a former employee will inevitably do so. *See id.* (citing *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1306 (S.D. Fla. 2004)). Regardless of which approach is correct, the Court concludes that a restriction preventing Challa's employment setting up a cloud-based infrastructure to house IDI's

---

[5] To succeed on the merits of its claim, TRADS must also establish damages resulting from the breach. *See, e.g.*, *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1337 (M.D. Fla. 2010) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). The Court questions whether TRADS will be able to do so in light of the findings and conclusions set forth herein (*i.e.*, that Challa has not used or disclosed any of TRADS' confidential or proprietary information, or otherwise caused any harm to TRADS, in the course of his employment with IDI). Nevertheless, because the Court ultimately concludes on other grounds that TRADS is not entitled to preliminary injunctive relief, the Court declines to conclude that TRADS will be unable to establish damages.

data fusion products is reasonably necessary to protect TRADS' legitimate business interest in its confidential and proprietary information. The question is close in this case: On one hand, the evidence presented establishes that the data fusion industry is highly competitive, that infrastructure and data fusion products are necessarily intertwined, and that Challa had access to much of TRADS' confidential and proprietary information—including most significantly the technical specifications of TRADS' core data fusion software product, TLOxp—while employed with TRADS. On the other hand, Challa testified convincingly that he has not used and need not use any of TRADS' confidential or proprietary information in his employment with IDI. Balancing all of the evidence in light of controlling principles, however, the Court ultimately concludes that a restriction preventing employment at IDI in the specific capacity in which Challa is currently employed is reasonably necessary.

Accordingly, TRADS has a substantial likelihood of success on the merits of its claim for breach of the Agreement.[6]

### 2. Irreparable Injury

TRADS must next establish that irreparable injury will be suffered unless the injunction issues. "A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (internal quotations marks omitted). Having established a substantial likelihood of success on the merits of its claim for breach of a restrictive covenant, TRADS is entitled to a presumption of irreparable injury. "The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant."

---

[6] Challa does not dispute, and the Court concludes, that the Agreement otherwise meets all statutory requirements, as the Agreement is set forth in writing and signed by Challa, the Agreement's duration of one year following the end of Challa's employment with TRADS is reasonable, and the Agreement's geographic area (anywhere in the world) is reasonable in light of the nature of the data fusion industry.

*Proudfoot*, 576 F.3d at 1231 (quoting Fla. Stat. § 542.335(1)(j)).[7] However, this presumption is rebuttable. *Id.* (citing *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. Dist. Ct. App. 2006)).

The Court concludes that Challa has presented sufficient evidence to rebut the presumption of irreparable injury. While Challa's employment with IDI endangers the confidential and proprietary information to which he had access while employed by TRADS, Challa presented substantial credible evidence—mostly in the form of his own testimony—establishing that he has not used or disclosed any of that information in the course of his employment with IDI. Among other things, Challa presented a thorough explanation of the nature of his position at IDI, the publicly available information on which he relies in that position, the skills, experience, and knowledge he has obtained outside of his employment at TLO and TRADS, and the reasons why he has no need for TRADS' confidential and proprietary information in his position at IDI, despite the close relationship between hardware and software in the data fusion industry. In other words, anyone with skills similar to Challa's could set up a cloud-based infrastructure to house IDI's data fusion products without ever having worked for TLO or TRADS. Requiring Challa to cease his employment with IDI would do nothing to prevent the development of idiCORE or the migration of IDI Basic and idiCORE onto a cloud-based infrastructure. Furthermore, more than 14 months have passed since Challa had access to any of TRADS' confidential and proprietary information, and both parties presented evidence

---

[7] The Eleventh Circuit recently concluded that this "presumption of irreparable harm is not arbitrarily granted by Florida's statute, but is the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake." *TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) (citing *DePuy Orthopaedics, Inc. v. Waxman*, 95 So. 3d 928, 939 (Fla. Dist. Ct. App. 2012)). As such, this presumption does not eliminate the procedural burden of establishing irreparable harm, but instead "prescribes how irreparable injury is established in the restrictive covenant context." *Id.*

establishing that the data fusion industry is rapidly evolving. In short, TRADS will not suffer irreparable injury in the absence of an injunction.

### 3. Balance of Harms and Public Interest

Because Challa has presented sufficient evidence to rebut the presumption that TRADS will suffer irreparable injury unless an injunction issues, TRADS is not entitled to preliminary injunctive relief. *See Siegel*, 234 F.3d at 1176. Accordingly, the Court need not consider whether the threatened injury to TRADS outweighs whatever damage the proposed injunction may cause Challa, nor does the Court need to consider whether the injunction would be adverse to the public interest.

### IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction [DE 8] is **DENIED**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 23rd day of March, 2016.

Copies furnished to:  
Counsel of record

ROBIN L. ROSENBERG  
UNITED STATES DISTRICT JUDGE